**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe, a minor, by and through her Special Conservator, Josephine Gortarez,<br><br>        Plaintiff,<br><br>vs.<br><br>Department of Homeland Security,<br><br>        Defendant. | No. CV09-1329-PHX-DGC<br><br>**ORDER** |

Plaintiff is a minor child who brought suit in Maricopa County Superior Court against the Scottsdale Unified School District ("SUSD") and American Building Maintenance Co. ("ABM") "for personal injuries and other damages arising from [her] sexual assault, rape, assault and battery, false imprisonment, and other injuries sustained at the hands of a janitor, Roberto Lemus-Retana . . . an illegal alien, employed by [ABM] . . . while working at Saguaro High School in Scottsdale, Arizona." Doc. 32 at 13. Plaintiff alleges that SUSD and ABM negligently hired and supervised Mr. Lemus-Retana.

After filing the Superior Court litigation, Plaintiff initiated an inquiry into Mr. Lemus-Retana's alien status in the United States. *Id.* Plaintiff also sought records confirming the legal status of 95 employees who were working for ABM in 2006 while Mr. Lemus-Retana was employed. *Id.* at 13-15. She sought those records for purposes of potentially proving in the Superior Court litigation that ABM was negligent in screening its employees before hiring them. *Id.* at 1.

By stipulation, the United States Department of Homeland Security ("DHS")

provided Plaintiff with the relevant immigration information concerning Mr. Lemus-Retana. The information confirmed that he was in the United States illegally at the time of the assault. Plaintiff used immigration expert Neville Cramer to perform an investigation using the E-Verify system, which gave a preliminary indication that 93 out of 95 of ABM's other employees were not authorized to work in the United States. Doc. 33 at 1. After receiving this information, Plaintiff sent a request for disclosure to DHS, pursuant to 6 C.F.R. § 5.45 (the "*Touhy* request"), in which she sought written confirmation of the legal status of the 95 employees. Doc. 32 at 13-19. This Court ordered DHS to respond to the request by April 9, 2010. Doc. 27. On April 8, 2010, DHS responded and refused to provide Plaintiff with the requested information, claiming that it need not provide the information under relevant agency regulations. Doc. 32 at 24-26.

The parties have now submitted briefing on whether DHS should be required to comply with the *Touhy* request. Docs. 32, 33, 34, 35. For reasons that follow, the Court finds that DHS has not abused its discretion.

## I. APA Review.

This Court has authority to review DHS's denial of Plaintiff's *Touhy* request under the Administrative Procedures Act ("APA"). DHS asserts that APA review is required in this case (Doc. 33), and Plaintiff does not disagree (Doc. 34).

Under the APA, a court may "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, a reviewing court must determine whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Mt. St. Helens Mining & Recovery Ltd. P'Ship v. U.S.*, 384 F.3d 721, 728 (9th Cir. 2004). This standard "is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (internal quotation and citation omitted).

## II. *Touhy* Requests.

In *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), the Supreme Court upheld the authority of federal agencies to promulgate procedural regulations governing "the custody, use and preservation of [its] records, papers and property." Under *Touhy*, a federal agency can create its own regulations for when it will disclose information to third parties. DHS regulations for *Touhy* requests are found at 6 C.F.R. § 5.45 and 6 C.F.R. § 5.48. Under the regulations, DHS must consider the following factors in determining whether to grant a request for information:

> (1) Whether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose;
>
> (2) Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;
>
> (3) The public interest;
>
> (4) The need to conserve the time of Department employees for the conduct of official business;
>
> (5) The need to avoid spending the time and money of the United States for private purposes;
>
> (6) The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;
>
> (7) Whether compliance would have an adverse effect on performance by the Department of its mission and duties; and
>
> (8) The need to avoid involving the Department in controversial issues not related to its mission.

6 C.F.R. § 5.48(a).

The regulations also require the party requesting the information to explain why the information is relevant:

> If official information is sought, through testimony or otherwise, by a request or demand, the party seeking such release or testimony must (except as otherwise required by federal law or authorized by the Office of the General Counsel) set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought.

6 C.F.R. § 5.45(a).

///

# III.    Analysis.

DHS concluded that compliance with Plaintiff's request would be unduly burdensome, requiring 40 hours of initial inquiry and an additional 2,200 hours of investigation.  Doc. 32 at 25.  The Court finds this conclusion to be reasonable.

DHS based its estimate on a few important facts:  Plaintiff did not seek documents, but instead sought written verification of the immigration status of all 95 employees and designation of a DHS agent or officer to provide deposition and trial testimony.  *Id.* at 15.  The thrust of Plaintiff's request was a determination of whether the 95 employees were authorized to work in this country.  Such a determination, DHS explained, would require more than simple verification of immigration status:  "Having permission to be present in the United States and permission to work in the United States are two different matters. Individuals who may be lawfully present in the United States may not have authorization to work (i.e., nonimmigrant visitors for pleasure), while those who may be unlawfully present in the United States may have authorization to work (i.e., aliens who entered without inspection but have received work authorization through certain programs)."  *Id.* at 25.

DHS provided this explanation for its work estimate:

> Determining whether 95 individuals maintain lawful presence in the United States is a task that is not as simple as running names through a single database.  We estimate that running the names, dates of birth, social security numbers, and other identifying information through the appropriate DHS databases would require approximately forty man hours.  Once we obtain this information, we would likely have to conduct further investigation to confirm their status in the United States and then to determine whether they have authorization to work.  Such investigation would likely require pulling additional information from multiple databases, searching for and reviewing hard copies of documents and files, and potentially interviewing individuals as well.  As you may be aware, the non-existence of a record for an individual might mean that the individual is not lawfully present in the United States, but may also mean that the individual is a United States citizen.  As such, in-person interviews would be necessary to confirm whether or not these 95 individuals have authorization to work in the United States.  It is our estimate that compliance with your request would require approximately thirty days and involve ten investigators, for a total of 2200 man hours.  It is therefore our position that compliance would be unduly burdensome.

*Id.*

///

- 4 -

Plaintiff argues that DHS's estimate is wrong. Plaintiff provides the affidavit of its immigration expert, Neville Cramer, who opines that the entire search will take less than one hour. In providing this opinion, however, Mr. Cramer asserts that the search should be conducted by U.S. Citizenship and Immigration Service ("USCIS") in Los Angeles, not by Immigration and Customs Enforcement ("ICE") as suggested in DHS's response. *Id.* at 30. But Plaintiff's *Touhy* request did not ask that the search be conducted by USCIS; it specifically was directed to ICE. *Id.* at 13.

In addition, Mr. Cramer states that "[s]tatistics have shown from studies on the use of E-Verify that in most cases where information provided on the I-9's is not initially verified, the vast majority of cases result in 'No Record' being located at Homeland Security, or a record is located, but the alien is not legally authorized to work (as in cases where an alien has 'entered without inspection'). In these cases, *no further checks are required*, and the employee is determined to be unauthorized to work in the U.S." *Id.* at 30 (emphasis added). Mr. Kramer seems to be suggesting that DHS could rely on statistical probabilities and limit its search to initial database inquiries, but this certainly was never suggested in Plaintiff's *Touhy* request. That request sought "written verification," "signed or executed by an authorized agent or representative of the United States Department of Homeland Security," and an agent or officer to testify under oath in a deposition or at trial. DHS could not reasonably rely on mere statistical probabilities to provide such definitive proof of whether the 95 employees were authorized to work in the United States.

Moreover, if statistical probabilities are all that is needed, Mr. Cramer can provide that evidence himself. He has conducted the E-Verify search that has produced the initial results, and presumably could testify to their statistical significance.

DHS provided several other reasonable explanations for its decision to deny Plaintiff's request:

> In addition, we believe that our compliance with your request would require DHS to become involved in a matter between private litigants where a substantial government interest is not implicated. To do so would allow a private party to initiate enforcement actions against private businesses that may not already be the subject of an open DHS investigation. On the other

1
2          hand, to the extent that [ABM] or its employees are already under investigation
           by DHS, compliance with your request potentially could impede such
           investigation. Moreover, once it became known in the business community
3          that DHS would perform these checks at the behest of a private party, we could
           easily anticipate that other businesses would seek that we do the same so as to
           obtain a competitive advantage.
4

5    *Id*. at 25.

6          DHS also observed that Plaintiff had not demonstrated the relevancy of the requested

7    information in the state court lawsuit. *Id*. at 24. This conclusion was reasonable in light of

8    the fact that DHS had before it competing memoranda on the relevancy of the information

9    prepared by Plaintiff and ABM. ABM's memorandum, which argued that the information

10   would not be relevant, included a more detailed discussion of the law that would govern

11   relevancy in state court. Doc. 33-3.

12         As already noted, under the arbitrary and capricious standard, the Court must

13   determine whether DHS's decision was based on a consideration of the relevant factors and

14   whether there was a clear error of judgment. *Mt. St. Helens Mining*, 384 F.3d at 728. The

15   standard is highly deferential, presuming the agency action to be valid and affirming the

16   agency action if a reasonable basis exists for its decision. *Ranchers Cattlemen Action Legal*

17   *Fund*, 499 F.3d at 1115. The Court cannot conclude that DHS failed to consider relevant

18   factors or committed a clear error of judgment. Each of the factors considered by DHS is set

19   forth in the relevant regulations, and DHS's consideration of those factors was reasonable.

20   Affording the agency appropriate deference, the Court concludes that DHS's denial of the

21   *Touhy* request was not arbitrary, capricious, or an abuse of discretion.

22         **IT IS ORDERED:**

23         1.     Plaintiff's request for an order requiring DHS to produce the requested

24   information is denied.

25         2.     The Clerk shall terminate this action.

26         DATED this 7th day of September, 2010.

27

28
                                          _David G. Campbell_
                                          _____
                                                   David G. Campbell
                                                United States District Judge